Next case is number 25-2090 Shannon McDonald MD against the President of New Jersey State Board of Medical Examiners. Mr. Brown. Thank you your honor and may it please the court my name is Jack Brown I'm representing all of the appellants in this case and I'd like to reserve the three minutes of my time for rebuttal. Granted. Thank you. This narrow as applied case is about whether the state of New Jersey can criminalize speech between doctors and patients when those words cross state lines. It cannot. Appellants J.A. Michael Abel and Hank Jennings depend upon out-of-state specialists for potentially life-saving consultations about rare forms of cancer. Doctors McDonald and Gardner provide those consultations before ultimately going on to treat those cancers in their home states. J.A. One issue and I realize I'm take the due process issue may be out of sequence but does Michael Abel have standing to bring his due process claim? Yes he does your honor. And because why? And that's because as this court held in Salmon the New Jersey Board of Medical Examiners where the plaintiffs there had standing even though they were not presently pregnant because they had had children in the past intended to have more children and were determined to employ midwives to assist them with future home births. The Mr. Abel's son isn't determined to get cancer again. He is not. Hopefully he won't. Hopefully he won't. It's quite contingent and speculative as to whether he will. And he no longer receives protein proton therapy treatment. Well your honor we did allege in the complaint that the condition that Mr. Abel's son has had frequently recurs. It requires constant vigilance and we also allege that he needs those annual scans to monitor it to make sure that it doesn't come back. Which is as we alleged a likely event. We also allege like the plaintiffs in Salmon. What's the likely event? The likely event is that the cancer could come back. We provided allegations in the complaints that these type is this type of cancer recurs often. How often? Often enough that he requires constant monitoring. So is the monitoring make it irrelevant that the cancer come back? Because because the cancer is life threatening and there is that substantial risk of it coming back. Mr. Abel needs to be able to talk to Dr. McDonald if any of those scans find an anomaly. If he. When was the last time you had there was one anomaly a few years ago right? Was it correct? There was one anomaly a few years ago. When was that? I don't recall off the top of my head. Roughly how long? How many years ago was it? A few. I'm sorry I don't recall off the top of my head. 34567 or more. I believe it was at least three, but I don't recall your honor. When was the last time that he saw Dr. McDonald? That would have been after that that scan detected that anomaly. So going back to comment made by Judge Hardeman, you kind of hope he's out of the woods. It never comes back for his sake. And it looks to me like it's a it's a hypothetical future problem that you hope doesn't occur. Isn't that correct? It's certainly a problem that we don't that we hope doesn't occur. But the standard for eminence under the standing doctrine is not certainty that the future event will occur. It's whether or not there's a substantial risk that it will occur as the Supreme Court recognized in Susan B. Anthony List v. Dry House. And what that means per this court's past precedent is a realistic danger of sustaining a future injury. And that substantial risk does exist here. He has had this kind of cancer before. That cancer frequently reoccurs. His scans have detected anomalies before. And again, like the in Salmon, he did allege that he intends to consult with Dr. McDonald in order to prevent his son's life threatening cancer from coming back. Is there any doctor in New Jersey that could provide the same type of care that Dr. McDonald provides if there were an anomaly to occur in the future? No, we made allegations in our complaint about that. And that distinguishes this case from the merits of of Salmon. There, the plaintiffs did not allege any shortage of midwives or any other inability to obtain the requisite care. But we did make allegations about that. In our complaint, we talked about how there is no New Jersey physician who is capable of treating J.A.'s cancer and that Mr. Abel relies upon Dr. McDonald's expert expertise to maintain continuity of care and get that adequate level of care. How old is the son now? Beg pardon? How old is Mr. Abel's son? Um, he's still a child. He's, I believe, a teenager now, Your Honor. So so he but he's still a minor. Um, let's switch to the dormant commerce clause. Yes, Your Honor. This law doesn't discriminate against out of staters, does it? We believe that it does in its practical effect. We talk in the complaint about how it raises as applied. It raises the cost of doing business for out of state physicians by requiring them to get a duplicative New Jersey medical license. So even though it doesn't discriminate on its face, it does discriminate as it has a law that says that to get a license in this state, you have to be there. There's a check done by us on you and you pay a fee. That's for instators and out of staters. It's the same. So where's the dormant commerce clause angle here? If there isn't any real discrimination against an out of stater in terms of the check and the cost? It's because in order to speak with the New Jersey patients, um, a doctor who is who is out of state has to have a license in their home state and under this rule, um, one in New Jersey, whereas the New Jersey physician only needs one in in New Jersey. Um, so again, in its practical effect, if not in its face, it's mandating differential treatment between instators and outstaters that benefit the instators and impose a burden on the out of state physicians. But turning to the there's no, there's no case that supports that. There's no case factually like that at all, right? Uh, the, um, I mean, not exactly on the facts. No, but the, um, Supreme Court has made that holding about, um, discrimination of instators versus outstaters in the grant home case, um, where it discusses that issue. Um, but regardless, it's a it's a fact treating your argument isn't that Massachusetts doctors or Pennsylvania doctors are being held to a different standard than New Jersey doctors. You're saying that it's commercially onerous for them to be licensed in multiple states. Essentially. Yes. Okay. But there's no case that supports that you're seeking an extension of the Supreme Court's dormant commerce clause law on that. I don't see it as extending it because again, the Supreme Court's precedent does talk about discrimination, not just in its practice in it on its face, but in its case token from 1997 to repel the state's license requirement for for lawyers and saying, okay, for out of staters, there may be some incidental discrimination in terms of convenience, etcetera. But that does not create a dormant commerce clause problem. Talking is distinguishable from this case, Your Honor, for two reasons. Uh, first token was decided on summary judgment here. This is a motion to dismiss. In token, they had the benefits of discovery and a full factual record about the practical effects of the licensure rule there. And here we don't. Uh, second, unlike in token where the issue was inherently tied to in state activity, maintaining an in person law office here, the rule governs telemedicine, which by its very nature takes place across great distances. Let me ask you about the telemedicine part and make sure I understand what you're not arguing is I understand your briefs. You're not arguing that Dr McDonald or Dr Gardner have a right to come to New Jersey and perform physical operations. That's correct. Unless, of course, they get a medical license. Right. Okay. So what you're saying is New Jersey has a right to tell them they can't come to New Jersey to do surgery without a New Jersey license. But they do have a right to talk to patients in New Jersey. That's correct. Okay. But the talking is part of the treatment, right? No, it's not your honor. Not in this case. Well, how do you define treatment? Because I mean, a psychologist or psychiatrist talking to someone, would you say that's not treatment? No, but talk therapy. So talk therapy is treatment. Okay, so that you're saying they're different because it's it's the nature of of what psychologists and psychiatrists do is to talk. That's correct. But it's not in the nature of skull, uh, surgeons or proton therapy doctors to talk. Well, the issue is that, um, it goes to a question of the treatments that you're using to tackle the ailment. Talk therapy by its very, by its very nature involves using speech as treatment. All right. And do you reach involved here to treat the patient or no? It does not. Because what I don't form consent with the skull therapy or the therapy, they have discussions about whether or not the skull therapy or proton therapy is advisable. But the actual treatments and that's not part of the treatment, whether to have the operation or not. What course of medication regimen or treatment that isn't that isn't that isn't that part of the practice of medicine? No, that's that's merely speech about treatments. You can't treat cancer by talking at it, unlike with mental health issues with therapy. But, um, so you don't need to be a doctor to talk about those things. You don't need to be a doctor to talk about those things. I could tell a relative who has cancer, but isn't that why states regulate the practice of medicine? Because we don't want Dr Google treating our patients, or we don't want the neighbor next door who has the capacity to speak to tell us whether things like proton therapy is a good idea. Or isn't that the whole point here of professional licensure? This is a narrow as applied case that does not implicate professional licensure, licensure, licensure. Generally, it only implicates non treat. It only implicates speech within a profession about treatment. The Supreme Court recognized in NIF law that you can't restrict a group's First Amendment rights just by talking about it. And this court recognized in Veterans Guardian that speech is still protected even with if it occurs within the confines of a profession. Let's assume we agree with you on that. That speech is protected. And NIF law did say that there's no sort of exemption for professional speech, right? You lean on that appropriately. So, um, what standard of review are we applying? Rational basis, intermediate scrutiny, strict scrutiny. Because, uh, the rule on its face applies to these conversations between doctors and patients. Strict scrutiny should apply. But even if this court is inclined to say that it's a content neutral rule, intermediate scrutiny should still apply because it's, uh, it's delivered by speaking. It is still speech, and that's not a standard that the state can satisfy on a motion to dismiss. There needs to be a factual record to determine how well tailored the rule is to meet the state's interests. Well, isn't it content neutral? Because the state licensure rule is not telling Dr McDonald or Dr Gardner what to recommend or how to recommend it. It's so, you know, they could say, get get the treatment. Don't get the treatment. So isn't that sort of typical content neutrality? No, it's content based because the rule applies to doctors and patients talking about a specific topic that being medical advice in this case. So you concede it's viewpoint neutral, but it's not content neutral. That's correct. How do you get around to Castile case? Uh, Castile is distinguishable for a few reasons. One, Castile was a general challenge to a licensing requirement, not an as applied case, challenging only this narrow speech based issue. And I would also add that Castile again was decided on summary judgment after the court had the of a full factual record. Um, what facts do you hope to obtain here? If you get discovery, we hope to obtain information about the degree to which, um, the rule is tailored to the state's, um, interest in in regulating the practice of in. We hope to obtain information about, um, whether the, um, about whether does that look like? Is that documents? Deposition testimony? Give us give us your dream. Uh, you know, factual finding that you would get in discovery. What would really make your case a slam dunk if you got it in discovery? Well, certainly at a minimum, we would like, um, information from tell us what the information is. Give us give us the facts. What are the facts you hope to find in discovery that you'd get really? Oh, here's a smoking gun. We're gonna win this case. What are those facts? We'd like to find information about, um, why, um, it's necessary for the state to ban to categorically ban these types of consultations instead of using some other method that's less restrictive on speech to protect its interest. So why can't they just use New Jersey tort law to target to target wrongdoers? Or why can't they use criminal law to target wrongdoers? Um, as it stands, we think that the regulation burdens far more speech than necessary. Um, which means it fails intermediate scrutiny, never mind strict scrutiny. And, um, we believe that it's unconstitutional under the First Amendment on that basis. Why is it so burdensome? It's a small fee. It's what? $700 a year. If the new thing goes into effect, it's still 500 or 700 50 now or something like that. That still imposes a burden on their speech rights. No. Why? I can say whatever she wants. She just needs to pay the toll. Well, and if she's one of the foremost practitioners in this area, she could surely afford $500, right? In in the allegations in our complaints, we explained that one that fee that extra fee is not insignificant. And there are also, um, preeminent doctor at Mass General can't afford a $500 fee. It's expensive. Well, a month is the relative will cost you 400. That's just for a patient, not a dog. And we also included some allegations dealing with the need to meet things like continuing education requirements as as well. Um, and what does that entail? Why is that so onerous? Because it's an additional burden on top of the burdens that she already faces being licensed in in Massachusetts and elsewhere. Um, hospital. I'm surprised you haven't mentioned another thing that I thought was a much bigger burden. Is there anything else that's a really big burden? It's sort of an issue here. Well, it's also a significant burden on the patients because just on the doctor, yeah, but they do risk criminal penalties as well. If they has nothing to do with the fact that it's a million dollars in malpractice insurance in New Jersey and Massachusetts is only 100,000. No, it's not. Because, um, how much? How much is a million dollars in malpractice insurance gonna cost her a year? If medical malpractice is an issue, then that's an issue that can and should best be handled via New Jersey tort law. Um, as it stands, because how much? How much is a million dollars in malpractice going to cost her in premiums? It's it's It's quite It would be quite a significant amounts quite a lot more than the $500 told to become a New Jersey doctor, right? Yes. So this case is really about. She doesn't want to have New Jersey residents have the protection of a million dollars of malpractice insurance. She wants them to have the protection of Massachusetts law, which is $100,000 in malpractice insurance. With respect, your honor. No, it's not. It's because it the rule as applied to these non treatment conversations burdens more speech that is necessary to address any interest that the state has in targeting medical malpractice. Because again, it is this categorical ban on these non treatment communications, and I'll reserve the remainder of my time for rebuttal if there are no more questions. If the Supreme Court decides that conversion talk therapy is conduct rather than speech, how does that affect your First Amendment argument? It's ultimately would not undermine our First Amendment argument because the speech here is not treatment. It's simply speech about a topic that being future treatment. But either way, we should probably not decide this case until the Supreme Court decide decides. Child's right. We're more than fine with this court waiting until after child's has decided to issue its ruling. Thank you. Yeah. All right. We'll hear you on rebuttal. Thank you very much, Mr Brown. Let's hear from Mr Ruben. Uh huh. Uh huh. Thanks. Your honor, I may have pleased the court Nathaniel Ruben for the president of the board. As this morning's call, please have shown plaintiffs need to run the table to prevail on their First Amendment claim. They need to convince you that New Jersey's licensure rule, which looks principally to whether a physician has met objective educational and training standards, passes a background check and is indeed in good standing in another state somehow violates the Constitution. Can I ask you just if you wouldn't mind just to deal with the standing issue at the outset, and then we can go on to the Mr Abel or Abel, which if I'm mispronouncing it one way or the other, uh, does he have standing? Um, we disagree that he would have standing based on on the posture that is pled in this case where it's speculative whether, um, the cancer might recur. It's not something that he's trying to do. It's a it's something that might take place in the future. But at this point, we would see that as essentially the type of potential future injury as opposed to an actual existing injury. That would give him standing to assert the 14th Amendment claim. And so there's no intent to seek care at the moment of the four issues. Dormant Commerce Clause, privileges and immunities, First Amendment due process, which is the one sounds like you want to start off with First Amendment. We'd be happy to discuss the First Amendment first. Yes, I mean, was that where you were starting? Yes, Your Honor. Okay, why don't you go ahead? Um, certainly. So New Jersey's licensure rule fits with a long line of precedent upholding licensure schemes against First Amendment challenges under rational basis review. It has no bearing on the content of anything that a physician says or does, and it fits with an extraordinary history and tradition of medical licensure by states that spans our republic's history. Um, that is reflected in cases like Castile from this court, which upheld licensure for I don't think Castile helps you much. It's just a reciprocity case, and it was before NIFLA, right? So our view is that Castile is nonetheless still informative here for a couple of reasons. First, in applying a rational basis standard, we think the motive analysis is still relevant, even though Castile looked at the question of reciprocity was nonetheless for the content of the licensure requirement. Second, Castile made clear that it wasn't addressing the licensure rule as a question of professional speech, which is the category that's most affected by NIFLA. But third, even if we view NIFLA is more relevant to addressing the question now than Castile is, NIFLA nonetheless recognizes that there remains a role for states to regulate professional conduct through things like licensure schemes for medicine. Um, and that as a result of doing so, those licensure schemes can affect things like speech incident to professional conduct. So NIFLA cautions against using licensure requirements to impose substantive regulations on what somebody may say in the course of their professional speech. So the takeaway from NIFLA is that New Jersey can't pass a law that would limit Dr McDonald or Dr. Gardner from recommending a certain type of treatment or not. But it doesn't prohibit New Jersey from generally requiring people who practice medicine even while talking to have New Jersey licenses. Right. And then, you know, whether whether there might be how a question about a particular type of treatment might play out is, you know, possibly a separate one. But NIFLA would distinguish, yes, between those two types of laws, between a law that simply says you must be licensed to practice medicine, even though the practice of medicine does, as you recognize, your honor, involve many sorts of speech acts like informed consent, like diagnosis, like aftercare and following up with the patient. That threshold licensure question is a separate one is recognized from NIFLA from a question about what you could actually say or what you could actually do in the course of your professional care. What's your response to their argument that doctors Gardner and McDonald are admitting that they can't come to New Jersey to perform treatment or surgery? They just want to talk. So we would say that that speech remains part of a course of professional conduct, even though that professional conduct includes speech acts. It's not the case that speech incident to conduct would merely be speech associated with any one particular part of conduct, but rather associated with the course of conduct that takes place in the doctor patient relationship. So, for example, preparing to see a patient actually laying hands on the patient. What you say when you have a flashlight in a patient's throat, what you say to a patient after you've administered a blood test might all be ways in which a doctor will talk to a patient in the course of providing medical care and engaging in the conduct that is the practice of medicine. And we don't think it makes sense to to start drawing lines that say, look, if you have a conversation with a patient three days after a blood test versus seven days after a blood test, one of those things is professional conduct and the other is not. All right. So you assiduously avoided the word treatment and you said course of professional conduct. Are they different? I don't think they're necessarily different. The scope of treatment can be quite broad. And I think it's telling here that that as we understand it, plaintiffs allege that all of this constitutes part of the practice of medicine for which licensure would be required, certainly if this took place in any kind of in person. That was another question I had. Is this the type of if they do a zoom call on a checkup, hey, you got a bad scan. I mean, is that something that's prosecutable under this New Jersey law? Where's the where's the line of demarcation? I assume that if. Mr. Bell's son got a test done in New Jersey and they sent the test to Mass General. If Dr. McDonald looked at the results of the test and picked up the phone and called the Bell family and said, hey, you know, I don't like what this looks like. Uh, you should think about coming back up to Boston. Is that prosecutable or does that run afoul of the law at all? So there are always going to be obviously line drawing questions about what does and does what does and does not constitute the provision of medical services, which is where the licensure requirement kicks in. So there may well be cases that fall outside what constitute the provision of medical services. Um, the second thing I would point out, but you just avoided my hypo. I mean, can you give us any insight as to whether that's over the line, not over the line, close to the line? I'm sure. Um, so I like the one that that you pose just now. Um, it might fall on the side of providing medical services. But even if it did, it's not the it's not what plaintiffs allege is the type of consultation that is taking place in this case. They again purport to be bringing in as applied challenge to two particular types of speech acts that take place clearly within the course of providing medical services. A. Um, and they haven't argued or suggested that there would be a credible threat of enforcement in any such case and likely wouldn't have standing to to show that, um, if the doctor calls and says, based on this recent test, we're in a gray zone and this needs a little more testing to see if it's a concern or not a concern. That sounds like the practice of medicine. Correct? Um, that may that may constitute the provision of medical services, though. Again, um, the mirror again in in context like that, that might be sort of, I mean, only a doctor can tell you that if I pick up the phone and say that doesn't mean anything because I have no experience or training in medicine. But if a doctor calls you up and says that this is possibly concerning, we need to go do some further testing to see if it is or it isn't. Isn't that the practice of medicine? Uh, that would likely be the practice of medicine. Yes. And therefore what you're it sounds to me like the policy in New Jersey, at least from the briefing here, is that you need to do a check on every doctor. Sometimes they're great doctors, sometimes they're not. And you need to make sure that they they are, they line up. Well, there aren't a whole lot of malpractice cases against him, for example. And then after that, if they if they pass muster, they pay a fee and that's it. But you're trying to make sure that the practice of medicine in New Jersey, whether it be on the telephone or in person, is done in a way that protects your citizens. Isn't that correct? That's correct, Your Honor. And, um, it's notable that will plaintiffs don't purport to challenge the application of the licensure rule to in person medical conversations as well. Um, the the question of what does constitute the practice of medicine? What does constitute speech incident to professional conduct in delivering medical advice and in delivering the practice of medicine are all questions and all line drawing exercises that would exist just as much in person in conversations between a physician and a patient as, uh, as between, uh, as you know, whether it happens in a zoom conversation as well. To what? To what extent is the current case before the Supreme Court that's under review relevant or not relevant? We don't think that trials is particularly relevant here. Um, and, uh, that's for a couple of different reasons. But most importantly, uh, trials is is not particularly relevant because it looks specifically to the context of, of talk therapy as opposed to broader courses of medical conduct. And indeed, as the petitioners and trials, um, even, uh, admitted an argument. Um, the talk therapy context was distinct from the context of conversations that take place between a doctor and patient in the context of a more involved physical treatment relationship that might involve, for example, things like, uh, performing hands on procedures or, or, um, uh, prescribing medications, giving directions on how to take them, things like that. For the questions. What standard or review do we apply? Uh, rational basis is the most appropriate standard of review on the first amendment question. And indeed, um, would resolve all the questions. But, but on the first amendment question, rational basis review is appropriate, um, in light of, uh, both disclosure and licensing requirements, get rational basis review in light of Castile, um, in light of other circuits that have applied rational basis review to licensure requirements. Um, like for example, uh, the 11th circuit with nutritionists and Del Castillo. Um, so, so this court can do the same thing here in applying rational basis review. Are we clear that a tier of scrutiny applies at all? The Supreme Court's been doing a lot of history and tradition lately. And here there's an unbroken record, um, except for a brief period, I think during the Jackson administration of medical licensure. Um, is this, uh, I guess pretty niffly, you might have been tempted to say that there's just the licensing carve out from speech, whether you're a doctor, a lawyer, an  um, but Nifla may have changed that. What's your view on all that? Um, we certainly think that, that, that's another, uh, uh, another way that you could look at this and I think would be a very viable way to look at this in light of the Supreme Court's decision in Vidal versus Elster. Um, where of course that was a trademark case, but the court recognized that, uh, there's a long tradition of trademark of trademark regulation and indeed even content based trademark regulation that can coexist with the first amendment. And certainly, um, medical licensure is something that has long coexisted with the first amendment, of course, throughout our own country's history. Um, but if you look to judge Krause's concurrence and veterans guardian as well, um, indeed dating back long before, long before our country in, um, certainly the American Anglo American legal tradition, um, it has, it has long been the practice to ensure that physicians who practice medicine and indeed the full scope of medicine are qualified ones. Well, you have a little bit of time left, but I'm not sure we have any questions left. I guess I'll, I'll give you a minute just to tell us about the dormant commerce and, uh, um, yeah. Privileges and immunities. I assume from what the briefs were that it's just a non discrimination principle. Is that, is that all it is or is there more? Um, that's exactly right. Your honor, the court's already identified the issues with dormant commerce claim. Um, there's no discrimination. It's the same rule for everyone, regardless of where a physician lives. Um, if they, uh, want to practice and see patients in New Jersey via telemedicine, same as in person, they need a New Jersey license to do so. Residency bank accounts, principal place of business, any of the, any of those things have nothing to do with that. And likewise, this court has long upheld far more restrictive regulations in cases like Tolkien and Hefner. Um, same for the privileges and immunities issue because the licensure requirement is non discriminatory. Uh, it's simply, uh, plaintiff's claim simply fall short here. Um, all right. Thank you, Mr Ruben. We'll hear Mr Brown's rebuttal. If I may ask the, uh, the outset of the four issues, which do you want to emphasize the most? Uh, the first amendment issue, your honor, because, uh, because we think that it's the strongest, it's the strongest one. Yes. But turning back to to to standing briefly, I would just like to emphasize, um, that Mr Abel does face burdens under the rule. Um, if it's upheld because if this court says that he has no standing, um, it imposes a burden on him getting these potentially life saving consultations because they impose travel expenses on him. And that added money and time could put his son's health at risk. I would also add that there is a currently still a lower court opinion that would deprive him of relief if he's bounced on standing here. And we would ask that if this court the question here is if you last seen dr mcdonald at the least a few years ago when there was an anomaly and nothing has happened since and you're not anticipating anything necessarily happen happening unless it comes out of the blue is that hypothetically really so conjectural or so hypothetical and so conjectural that at this point you don't really have standing. That's that would be the argument. We disagree because he does need those annual scans and this type of cancer does come back frequently bouncing him getting an annual scan right now. Yeah, he does get an annual scan right now in new jersey. Um, yes. And then he sends the results to dr mcdonald. Um, and again, that highlights I think what the case is really about, which is after care, right? I mean, these these nationally recognized doctors, uh, have patients come to them from all around the country to get specialized care. And your clients are saying they're going to perform their treatments in boston and Pittsburgh. Word. But they'd like to continue serving the patient after the treatment occurs. And that service would be by talking through phone or or video calls, right? We do talk about how, um, before the actual treatment occurs, they do talk with dr mcdonald and and just to be clear, um, this is a service that is heard by speaking. So it falls within veterans guardian. It is content based because on the face of the rule, it applies to speech about medical care. If dr mcdonald, we're talking to J. A. And Mr Avell about the latest Oscar winners, the rule wouldn't apply. And it's also speaker based because on its face, it applies to, uh, doctors and patients. It's about, but it's about a doctor patient relationship that your clients want to continue. Obviously, when when J. A. Went to boston for treatment, there was a doctor patient relationship established in the state of Massachusetts. That's correct. Yes. And the patient would like that relationship to continue but not have to always travel to New Jersey to get to just talk. Yeah, to just talk. But they're not talking about the Oscars. They're talking about medical issues. Which sounds like course of medical care, maybe not treatment. I don't know the word. What's your, what's your response to what you heard from Mr Rubin about a course of medical care? Isn't that talking part of the course of medical care? It's not about the Oscars. It's because as applied, it's this case is only challenging the telemedicine rule. So it only applies to telemedicine and it only applies to these types of consultations. Now, there are certainly other aspects of the course of medical care of or medical treatments of which speech may be a subordinate part. But that is not the case here is only as applied to these non treatment conversations. Thank you. And again, help us define a non treatment conversation. Well, um, here it's just, it's, I'm not asking a rhetorical question. If we're going to write an opinion that goes your way in this case, we're going to have to describe the contours. You've conceded as you must that the treatment is requires a medical license. You're saying this isn't treatment, it's just talk. If if we go your way, we're going to have to craft an opinion that delineates those to help us do that. I don't, I don't know where we are on that. Well, it's, um, straightforward in the sense that it's the actual activity that is directly addressing the ailments that the, that the client, the medical client, the patient is, is suffering from. So what differentiates this case from talk therapy, where the speech itself is the treatment, it's addressing the mental health issue. Here, the it's the therapy, or not the therapy, but like the the proton therapy or the surgery afterward, that is the actual treatment. And the speech is about whether or not that treatment is is advisable. That's a line that other circuit courts have drawn, including the Ninth Circuit in the Conan case. And it's one that I think this this court can draw here too. So everything that comes after the surgery or the treatment is non regulable speech? Well, it depends on what exactly happens after the surgery or treatment. If he needs to go back in for another surgery, then of course, that would still that would be treatment. Um, but if they're just all the run up to going back into that surgery, all of the discussions over all the telemedicine that occurs, none of that's regulable. Um, all of that is speech. But under your theory, it's not regulable. It can't require a medical license. Because it's speech under under a theory, it at least needs to satisfy intermediate scrutiny, which can't be satisfied on 12 p six. And what's the substantial burden? What? Well, the substantial burden leaving aside the issues for the patients that I discussed earlier, which is the burden of travel, um, to for the doctors with the substantial burden for the doctor. But for the doctors, that burden of the additional licensure is not just, um, the extra money from having the duplicate duplicative, excuse me, license. It's also additional record keeping per state that they are licensed in. It's additional continuing education per state that they are licensed in. Um, that in, you know, imposes a burden on their speech if they want to talk to a patient in New Jersey. And the state has not shown that, um, that the rule doesn't burden substantially more speech than the necessary to address its interests in, um, regulating the practice of medicine without burdening these types of non treatment conversations. So you want to talk to the other side? All right. Thank you very much. Um, thank you, Mr Brown. We this is a little irregular, but Judge Ambrose had a question of Mr Ruben and we'll give you a chance to come back up if you want it because you do get the last word, Mr Brown. Sounds good. Thank you. When we spoke before, I was mentioning that there conceivably our policy reasons why you want to make sure you have regulation of qualified doctors. But when Covid hit, you suspended a lot of these protocols. And in fact, somebody could talk with somebody over the phone. Uh, and you had you got approval within 24 hours of applying and you waive the fee. I guess that stopped in some time in March of 23. Why didn't you continue that? Um, your honor, the Covid temporary emergency licensure program was always branded as and intended to be temporary on set up as such. Uh, that was in recognition of a unique public health crisis. That was with their massive problems or significant problems that occurred during Covid that made you want to go back and reinstate what you had previously. Um, we wanted on an ongoing basis to ensure the continued quality of care going forward and and, uh, wanted to ensure that we were able to maintain the integrity of our licensing system that involved our state indeed verifying that other states either were compact members and had met sufficient standards. Um, and and that physicians coming in from those states were licensed and in good standing in their compact states or that positions coming from non compact states were, uh, indeed licensed and in good standing and we're coming from states that had set sufficient standards. Um, and that we had a licensing system that was ultimately accountable to New Jersey's board of medical examiners who are accountable to New Jersey's voters and able to maintain New Jersey standards of care on an ongoing basis. Um, and I think it's just a general matter of sort of means and tailoring. Um, we don't think it makes sense to say, uh, a state's temporary emergency measures that were imposed during the pandemic should be what a state would be permanently held to going forward. To your knowledge, how many other states have similar requirements to what New Jersey has? Um, the vast majority of states have some, uh, essentially every state requires that, uh, uh, physicians who would practice telemedicine in their state obtain some sort of particular life qualification. Some states require licensure like New Jersey does. Other states have ongoing reciprocity agreements, um, with with particular other states. And when it comes to the licensure compact, I believe there are about 38 states that are members now that allow for for essentially expedited interstate licensing for physicians. Thank you. Thank you, Mr Ruben. Mr Brown, is there anything you'd like to address based on what you just heard? Mhm. Certainly, Your Honor, I would just like to, um, emphasize for this court and before we wrap up that the waiver of the rule, um, during the covid pandemic cause New Jersey's interests in maintaining it into question that it ultimately does need to justify. Um, if it's going to restrict speech, we able to conduct discovery on that issue and whether or not the rule is appropriately tailored. And, um, we can't the state simply can't meet its burden on that issue on a 12 to 6 motion. Thank you. All right. Thank you, counsel for both sides. For the helpful argument, the court will take the matter under advisement.